## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**MARK W. DOBRONSKI,**

        Plaintiff,

v.

**WINRED, INC.**, *et al.*

        Defendants.

Case No. **2:24-cv-12513-SJM-CI**

Honorable Stephen J. Murphy III
United States District Judge

Honorable Curtis Ivy, Jr.
United States Magistrate Judge

_____

## PLAINTIFF MARK W. DOBRONSKI'S
## RESPONSE IN OPPOSITION TO
## DEFENDANTS WINRED, INC.'S AND
## WINRED TECHNICAL SERVICES, LLC'S
## <u>MOTION FOR RULE 11 SANCTIONS</u>

Plaintiff MARK W. DOBRONSKI, appearing *in propria persona*, hereby

responds in opposition to Defendants Winred, Inc.'s and Winred Technical Services,

LLC's Motion for Rule 11 Sanctions [ECF No. 14], and respectfully requests that this

Court deny the motion for the reasons set forth in the accompanying brief.

        Respectfully submitted,

Date: November 20, 2024

        _____
        Mark W. Dobronski
        Post Office Box 99
        Dexter, Michigan 48130-0099
        markdobronski@yahoo.com
        (734) 641-2300
        Plaintiff *In Propria Persona*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**MARK W. DOBRONSKI,**                    Case No. **2:24-cv-12513-SJM-CI**

             Plaintiff,                    Honorable Stephen J. Murphy III
                                       United States District Judge

v.

                                       Honorable Curtis Ivy, Jr.
**WINRED, INC.**, *et al.*                    United States Magistrate Judge

             Defendants.

_____

**PLAINTIFF MARK W. DOBRONSKI'S**
**BRIEF IN OPPOSITION TO**
**DEFENDANTS WINRED, INC.'S AND**
**WINRED TECHNICAL SERVICES, LLC'S**
<u>**MOTION FOR RULE 11 SANCTIONS**</u>

**CONCISE STATEMENT OF THE ISSUES PRESENTED**

Should Defendants motion for sanctions be denied where Defendants failed to comply with the "safe harbor" service requirements of Fed. R. Civ. P. 11(c)(2)?

        Plaintiff says:      Yes.

Should the Court impose sanctions upon Plaintiff pursuant to Fed. R. Civ. P. 11 for filing his Complaint where Defendants have failed to provide any evidence that: the Complaint is: (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay.

        Plaintiff says:      No.

## CONTROLLING OR MOST APPROPRITE AUTHORITY

*Horton v. Tex. Fed. for Children PAC, Inc.*, 2023 WL 3136422 (N.D. Tex. April 27, 2023)

*Tahfs v. Proctor*, 316 F.3d 584 (6th Cir. 2003)


*In the Matter of Rules and Regulations Implementing the TCPA*, 7 FCC Rcd. 8752, 1992 WL 690928 (FCC, 1992)

*In the Matter of Rules & Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 2015 WL 4387780 (FCC, 2015)


Fed. R. Civ. P. 5

Fed. R. Civ.  P. 11

## INTRODUCTION

Plaintiff MARK W. DOBRONSKI, like the majority of Americans, is fed up with receiving unwanted robocalls and robotexts on his home and cellular telephones. Defendants Winred, Inc. and Winred Technical Services, LLC (collectively referrred to herein as "Defendants") are participants in flooding the cell phones of Americans with unwanted robocalls and robotexts. Dobronski received over 82 text messages to his cellular telephone seeking political donations for various political campaigns, all of the messages which included a message of "Paid for by WinRed." Sending "STOP" messages in response did nothing to curtail the text messages; more unwelcome messages "Paid for by WinRed" continued to be received by Plaintiff. Having had his fill of the unwelcome text messages, Dobronski decided to do something about it. Dobronski filed the instant civil lawsuit which arises under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq. See* Complaint [ECF No. 1].

The Complaint was filed on September 25, 2024. [ECF No. 1]. The summons and complaint were served upon both Defendants on October 3, 2024. [ECF No. 6 and 7]. No sooner was the lawsuit filed and served, Defendants stepped up on October 17, 2024 – and even before they answered or responded to the Complaint – gives "safe harbor" notice to Plaintiff that Defendants intend on filing a motion for sanctions under Fed. R. Civ. P. Rule 11. Thereafter, on October 24, 2024, Defendants filed a Motion

to Dismiss. [ECF No. 9].   This was then followed, on November 8, 2024, by Defendants' filing their instant Motion for Sanctions. [ECF No. 14].

It becomes quickly apparent that the sole purpose of Defendants' motion practice is to harass, cause delay, and needless increase the cost of this litigation. Indeed, as will be shown, *infra*, Defendants have made deliberate misrepresentations to this Court in an effort to "trump" up allegations against Plaintiff.

## LEGAL STANDARD

A court may impose sanctions when the court determines that the requirements of Rule 11(b) have been violated. Rule 11(b) provides:

> "(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

6

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information."

Fed. R. Civ. P. 11(b). Rule 11 requires attorneys to refrain from pursuing meritless claims. *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 627 (6th Cir. 2010). A court may impose sanctions if "a reasonable inquiry discloses the pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." *Id.* (quoting *Herron v. Jupiter Transp. Co.*, 858 F.2d 332, 335 (6th Cir. 1988)). However, making the foregoing "determinations is difficult when there is nothing before the court except the challenged complaint." *Tahfs v. Proctor*, 316 F.3d 584, 594 (6th Cir. 2003).

The test for determining whether to impose "sanctions is whether [an] individual's conduct was reasonable under the circumstances." *Tropf v. Fidelity Nat'l Title Ins. Co.,* 289 F.3d 929, 939 (6th Cir. 2002) (quoting *Union Planters Bank v. L & J Development Co., Inc.*, 115 F.3d 378, 384 (6th Cir. 1997)). Reasonableness should be assessed under an objective standard. See *Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 958 (6th Cir. 1990). Courts should test the reasonableness of conduct by determining "what was reasonable to believe at the time the pleading, motion, or other paper was

submitted[,]" and should avoid using the "wisdom of hindsight" in their determinations. *Merritt*, 613 F.3d at 626.

Further, in general, a court should "be hesitant" to determine that a complaint violates Rule 11(b) when a suit is dismissed at the motion to dismiss stage. *Tahfs*, 316 F.3d at 594. Yet, a court may proceed with less hesitation when a party moves for sanctions after discovery is complete and there is a motion for summary judgment before the court. *Id.* Although courts should be watchful of complaints that assert baseless allegations, "Rule 11 is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." *Id.* at 595 (quoting *McGhee v. Sanilac Cnty.*, 934 F.2d 89, 92 (6th Cir. 1991)). In *Tahfs*, the Sixth Circuit cautioned against determining that a party violated Rule 11 at the motion to dismiss stage of proceedings. Indeed, it expressly warned against reading "[un]warranted by existing law, as the expression is used in Rule 11(b)(2)[,]" to mean all claims that fail to satisfy Rule 12(b)(6). *James v. Caterpillar, Inc.*, 824 F. App'x 374, 378 (6th Cir. 2020) (quoting *Tahfs*, 316 F.3d at 595 (internal quotations marks omitted)). As the Advisory Committee Notes explain, parties should not employ a Rule 11 motion "to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes." *James*, 824 F. App'x at 378 (quoting Fed. R. Civ. P. 11(b), (c) advisory committee's note to the 1993 amendment.).

## PRELIMINARY ISSUES

## I.   PLAINTIFF WAS NOT SERVED THE MOTION

Fed. R. Civ. P. 11(c)(2) provides:

> "(2) Motion for Sanctions. A motion for sanctions must be
> made separately from any other motion and must describe
> the specific conduct that allegedly violates Rule 11(b). The
> motion must be served under Rule 5, but it must not be filed
> or be presented to the court if the challenged paper, claim,
> defense, contention, or denial is withdrawn or appropriately
> corrected within 21 days after service or within another time
> the court sets. "

Fed. R. Civ. P. 11(c)(2).  A copy of the proposed motion which Defendants sent to

Plaintiff via electronic mail on October 17, 2024 is attached hereto at EXHIBIT 1

("Proposed Motion").  Even a cursory review will reveal that there are substantive

differences between the copy of the Proposed Motion served upon the Plaintiff and the

actual Motion that was filed with the Court.  Given that the Proposed Motion which

was emailed to Plaintiff on October 18, 2024 is substantively different from the actual

Motion which was filed with the Court on November 8, 2024, Defendants did not

properly comply with Fed. R. Civ. P. 11(c)(2).  Rule 11 provides that a motion for

sanctions "must be made separately from any other motion and must describe the

specific conduct that allegedly violates Rule 11(b)." See Fed. R. Civ. P. 11(c)(2). Any

such motion must be served on the offending party twenty-one days before it is filed

with the court. Rule 11's "safe harbor" provision provides that a party seeking

9

sanctions must serve the motion papers on his adversary, but not file the motion for 21 days after service to give his adversary an opportunity to withdraw the offending pleading or motion. See Fed.R.Civ.P. 11(c)(1)(A). See also 5A Wright & Miller, Federal Practice and Procedure: Civil 2d § 1337 at 69 (West 1998 pocket part) ("The safe harbor period begins upon service of the sanctions motion, but counsel are expected to give informal notice of the potential violation before preparing the sanctions motion. A party's failure to give advance notice may result in denial of its motion for sanctions.") (internal quotations omitted). Any such motion must be served on the offending party twenty-one days before it is filed with the court. *Adams v. Taylor*, 643 F.Supp.3d 392, 395 (W.D.N.Y., 2022). Any motion seeking Rule 11 sanctions that does not comply with these provisions must be denied. *Id.* Courts have held that where a movant failed to provide court with copy of papers that were allegedly served on opposing counsel 21 days before filing motions for Rule 11 sanctions and failed to provide proof that service was accomplished, movant failed to comply with safe harbor provision and, thus, was not entitled to Rule 11 sanctions. See *Cannon v. Cherry Hill Toyota, Inc.*, 190 F.R.D. 147, 159 (D.N.J.,1999). The plain language of subsection (c)(1)(A) requires a copy of the actual motion for sanctions to be served on the person(s) accused of sanctionable behavior at least twenty-one days prior to the filing of that motion. *Roth v. Green*, 466 F.3d 1179, 1192 (10th Cir.,2006)

*cert. denied* 128 S.Ct. 69, 552 U.S. 814, 169 L.Ed.2d 18.  Given that the Defendants did not serve the actual Motion for Sanctions upon Plaintiff at least 21 days prior to the filing of motion, the motion should be **denied**.

Further, Plaintiff will also note that the "safe harbor" notice of the Proposed Motion was sent to  Plaintiff via electronic mail on October 17, 2024. [Exhibit 2, ¶ 5]. No copy was received by Plaintiff via U.S. Mail. [Exhibit 2, ¶ 6]. There is no certificate of service showing how Plaintiff was served with the "safe harbor" notice of the Proposed Motion.  Plaintiff is appearing in this matter *pro se*.  As a *pro se* party, Plaintiff is not a registered user of the court's electronic filing system. [Exhibit 2, ¶ 7]. *See, also,* Fed. R. Civ. P. 5(b)(2)(E).  Further, Plaintiff has not consented in writing to delivery by any other means. [ECF No. 2, ¶ 8]. *See, also,* Fed. R. Civ. P. 5(b)(2)(F). Thus, not only was Plaintiff not served with the actual Motion, the "safe harbor" notice of the Proposed Motion was not served upon Plaintiff in compliance with Fed. R. Civ. P. 5.

## II.   DEFENDANTS' MOTION FOR SANCTIONS IS, AT BEST, PREMATURE

Essentially, Defendants' instant Motion for Sanctions [ECF No. 14] is nothing more than a rehash of the arguments raised in their Motion to Dismiss [ECF No. 9] under Fed. R. Civ. P. 12(b)(6) which Defendants filed two weeks prior.  Plaintiff has already addressed many of the substantive legal bases which Defendants raise

regarding the Complaint in Plaintiff's Response in Opposition to Defendants' Motion to Dismiss. [ECF No. 15]. In considering a Rule 12(b)(6) motion, a district court must limit its inquiry to the four corners of the complaint. *Trustees of Detroit Carpenters Fringe Benefit Funds v. Patrie Const. Co.*, 618 Fed.Appx. 246, 255 (6th Cir., 2015). Likewise, for purposes of the instant Motion for Sanctions, this Court is constrained to limiting its inquiry to the four corners of the Complaint. As a general proposition, a district court should be hesitant to determine that a party's complaint is in violation of Rule 11(b) when there is nothing before the court, save the bare allegations of the complaint. *Dayco Products, LLC v. Kingdom Auto Parts, Ltd.*, 2008 WL 4387702, at *3 (E.D.Mich.,2008) citing *Tahfs v. Proctor*, 316 F.3d 584, 594 (6th Cir.,2003).

## ARGUMENT

## I. WHETHER PLAINTIFF'S CLAIMS HAVE A REASONABLE BASIS

### A. Whether Plaintiff Has Basis for Alleging Defendants Sent Him The Text Messages

As a starting point, WinRed argues "there is absolutely no evidentiary basis to assert that Defendants sent or caused the text messages identified in the Complaint to be sent." [ECF No. 14, PageID.90]. Defendants then begin trying to distance themselves from the text messages by stating that "[neither WRTS nor WRI send text message solicitations is support of any campaigns. " [ECF No. 14, PageID.97]. Defendants assert that "neither WRTS nor WRI sent messages to Mr. Dobronski."

[ECF No. 14, PageID.98].

This case is at the pleading stage.  At the pleading stage, Plaintiff's obligation is only to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Under the liberal pleading requirements of the Federal Rules of Civil Procedure a complaint need contain only the most basic grounds upon which the court's jurisdiction is based and a short statement of the claim and the relief sought; concomitantly liberal discovery rules permit parties to flesh out their respective claims, defenses, and counterclaims, in due course after issue has been joined. *In re Boland*, 79 F.R.D. 665, 668 (D.C.D.C.,1978).  And, at the pleading stage, the Court may only consider the four corners of the Complaint.

Apparently, Defendants did not read the Complaint.  The Complaint expressly alleges that, at the end of each text message, there was a disclosure "Paid for by WinRed." [ECF No. 1 PageID.16, ¶ 65].The disclosure appears in patriot colors of red, white, and blue, as follows:



Given that each text included the disclosure "Paid for by WinRed," a reasonable person would be inclined to believe that Defendants are intimately involved in the sending of the text messages.

Likewise, Defendants do not have to be the actual sender of the text messages, but may be so involved in the process that they have vicarious liability. [ECF No. 1, PageID.11, ¶ 44]. The FCC "look[s] to the totality of the facts and circumstances surrounding the placing of a particular call to determine: 1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA." *In the Matter of Rules & Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 7980, 2015 WL 4387780, * 11, ¶ 30 (2015). According to the FCC, "[w]hether a person who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes may also be a factor in determining whether the platform provider is so involved in placing the calls as to be deemed to have initiated them." *Id.* at 7980-7981, *11, ¶ 30. In the instant case at bar, Defendants provide a platform to their political clients. Defendants so much as admit, in their Motion, that they are knowledgeable of the fact that their political clients are utilizing Defendants' platform to send text messages to consumers seeking political donations, and further acknowledge that many of these

14

consumers have complained regarding the unwanted text messages. [ECF No. 14-12].

At all times, Defendants had control over their platform, including the ability to

terminate the illegal telemarketing activity, but took no action to curtail same. Instead,

Defendants engaged in willful blindness and elected to benefit from the overall

scheme, thereby pocketing over $60 Million. [ECF No. 1, PageID.15, ¶ 62]. Under

these circumstances, the FCC deems Defendants to have "initiated" the calls. And,

other courts have also so held. See, *e.g., Cunningham v. Montes*, 378 F.Supp.3d 741,

750 (W.D.Wis., 2019); *Office of Attorney General v. Smartbiz Telecom LLC*, 2024 WL

4251895, at *8 (S.D.Fla., 2024); *Komaiko v. Baker Technologies, Inc.*, 2020 WL

1915884, at *17 (N.D.Cal., 2020) (Plaintiffs' allegations regarding the extent of

Baker's involvement in its clients' telemarketing text campaigns raise a plausible

inference that Baker initiated the texts received by Plaintiffs); *Arizona v. Michael D.

Lansky L.L.C.*, 2024 WL 3657129, at *15 (D.Ariz., 2024) (Defendants had actual

notice of the illegal use of [Defendants' platform] and failed to take steps to prevent

such transmissions and that Defendants were sufficiently involved in the illegal calls

to be deemed to have initiated them); *De la Cabada v. Ytel, Inc.*, 2020 WL 1156909,

at *5 (N.D.Cal., 2020) (finding liability against defendant where defendant was aware

of its customer's repeated TCPA violations and defendant continued to facilitate the

violations by offering the customer the use of defendant's platform).

**B.      Whether Plaintiff Consented To Receiving the Texts**

Next, Defendants argue that Plaintiff "consented to these calls," claiming that

Plaintiff "used the WRTS platform to make a $100 donation on April 11, 2020...."

[ECF No. 14, PageID.101]. Defendants are being disingenuous and are making a

knowing misrepresentation to this Court. In their Motion, Defendants make a damning

admission:

> "Mr. Dobronski should have known that neither WRTS nor
> WRI were sending him text messages because <u>he he never
> provided them the phone number that received the
> messages</u>.   <u>He gave a different phone number when
> donating through the WRTS platform</u>. (Ex. 1 ¶16)."

[ECF No. 14, PageID.95-96] (Emphasis added).

The TCPA and the Commission's rules plainly require *express* consent, not

implied or "presumed" consent.  *In the Matter of Rules and Regulations Implementing*

*the TCPA*, 30 FCC Rcd. 7961, 7991, 2015 WL 4387780, at *20, ¶ 52 (FCC, 2015)

(Emphasis as in original).  Persons who knowingly release their phone numbers have

in effect given their invitation or permission to be called at the number which they

have given, absent instructions to the contrary.  *Baisden v. Credit Adjustments, Inc.*,

813 F.3d 338, 342 (6th Cir., 2016) citing *In the Matter of Rules and Regulations*

*Implementing the TCPA*, 7 FCC Rcd. 8752, 8769, 1992 WL 690928, at *11, ¶ 31

(FCC, 1992).  The FCC was careful to distinguish between these permissible contacts

where a party "call[s] a number which was provided as one at which the called party wishes to be reached" and impermissible contacts where a party learns of a telephone number in another way, such as by capturing a telephone number via Caller ID. *Id.*

Thus, given Defendants' admission that Plaintiff never provided Defendants the phone number that received the text messages, it is axiomatic that Plaintiff never gave consent to receive text messages at his cellular phone number.

## II.   WHETHER COUNT 1 FAILS TO CREDIBLY ALLEGE AN ATDS WAS USED

Because plaintiffs face difficulty in knowing the type of calling system used without the benefit of discovery, plaintiffs can plausibly plead the use of an ATDS by alleging facts that indirectly suggest that such a device was used. *Horton v. Tex. Fed. for Children PAC, Inc.*, 2023 WL 3136422, at *4 (N.D. Tex. April 27, 2023). Such indirect allegations include "the content of the message, the context in which it was received, and the existence of similar messages." *Holt v. Facebook, Inc.*, 240 F.Supp.3d 1021, 1027 (N.D.Cal., 2017).

The Complaint alleges that Defendants, either directly, or through contracted third-party telemarketers, initiate telephone calls *en masse* using automated telephone dialing systems, which have the capacity to store or produce telephone numbers to be called using a random or sequential number generator to dial such numbers, to solicit consumers to contribute to Defendants' clients' political campaigns. [ECF No. 1,

PageID.15, ¶ 60].   The automated telephone dialing systems being utilized by Defendants have the capacity to use a random or sequential number generator to either store or produce phone numbers to be called; the autodialer uses the number generator to determine the order in which to pick the phone numbers form a pre-produced list and store those numbers to be dialed at a later time. [ECF No. 1, PageID.16, ¶ 64]. Plaintiff had no prior relationship with the Defendants. [ECF No. 1, PageID.10, ¶ 40]. The use of an automatic telephone dialing system to send the text messages is evidenced by the generic and impersonal nature of the text messages and the use of a link in each message. [ECF No. 1, PageID.19, ¶ 7]. The use of an automatic telephone dialing system to send the text messages is also evidenced by virtue of the fact that, when Plaintiff sent "STOP" messages in response to a received text message, a nearly instantaneous response of "You have successfully unsubscribed" was received. [ECF No. 1, PageID.19-20, ¶ 72].

Defendants argue, that "political campaigns typically make text solicitations through a TCPA-compliant P2P vendor" [ECF No. 14, PageID.103]. However, what may be "typical" does not necessarily translate into what actually occurred in Plaintiff's instance. Defendants suggests that the FCC has held that all peer-to-peer ("P2P") platforms are TCPA-compliant. [ECF No. 14, PageID. 103-104]. In actuality, the FCC held:

> "We do not rule on whether any particular P2P text platform is an autodialer because the record lacks a sufficient factual basis for us to confirm (or for commenters to assess) whether any particular P2P text platform actually works as claimed in the P2P Alliance Petition. We clarify, however, that if a texting platform actually "requires a person to actively and affirmatively manually dial each recipient's number and transmit each message one at a time" and lacks the capacity to transmit more than one message without a human manually dialing each recipient's number, as suggested in the P2P Alliance Petition, then such platform would not be an "autodialer" that is subject to the TCPA."

*In re P2P Alliance*, Petition For Clarification, 35 FCC Rcd. 6526, 6529, 2020 WL 3511100, at *4, ¶ 11.  In short, the FCC held that whether a peer-to-peer platform is an automatic telephone dialing system is a fact-intensive issue that must be considered on a case-by-case basis.  That issue will require discovery.

The fact that "political campaigns typically work from likely donor lists, rather than by sending texts to random or sequential numbers" [ECF No. 14, PageID.104] does not negate that an ATDS was used.  The Supreme Court observed that "an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list [and] then store those numbers to be dialed at a later time." *Facebook, Inc. v. Duguid*, 141 S.Ct. 1163, 1172, 592 U.S. 395, 407, fn. 7 (U.S., 2021).

As to Defendants lament that Plaintiff "does not even include copies of the alleged text messages" [ECF No. 14, PageID.104], their argument fails to acknowledge

that at the pleading stage, Plaintiff's obligation is only to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under the liberal pleading requirements of the Federal Rules of Civil Procedure a complaint need contain only the most basic grounds upon which the court's jurisdiction is based and a short statement of the claim and the relief sought; concomitantly liberal discovery rules permit parties to flesh out their respective claims, defenses, and counterclaims, in due course after issue has been joined. *In re Boland*, 79 F.R.D. 665, 668 (D.C.D.C.,1978).  Defendants can obtain copies of the all 82 violative text messages – as if they already do not have same – during discovery.

## III.   WHETHER COUNT 2 CREDIBLY ALLEGES A VIOLATION

### A.   Whether Plaintiff Fails To Allege Multiple Calls

Section 227(c)(5) promulgates:

> "A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may... in an appropriate court of that State... an action...."

47 U.S.C. § 227(c)(5).  The statute is clear that a private right of action accrues to "a person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection."  However, not every violation of the regulations prescribed under the

subsection has an attendant private right of action.

In the Complaint, Plaintiff has expressly alleged 82 text messages from Defendants. [ECF No. 1, PageID.17-19, ¶ 67]. Further, Plaintiff has also alleged additional text messages prior to February 26, 2024 which Plaintiff had inadvertently deleted from his cell phone. [ECF No. 1, PageID.19, ¶ 68].

The Complaint also clearly alleges that, immediately after receiving Calls 1, 3, 6, 7, 26, 37, 51, 58, 69, 73, and 74 Plaintiff sent "STOP" messages – clearly, a "do not call" request – to Defendants. [ECF No. 1, PageID.19, ¶ 69]. 47 C.F.R. § 64.1200(d)(3) requires that persons or entities making calls for telemarketing purposes that receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the telephone number of their do-not-call list at the time the request is made. 47 C.F.R. § 64.1200(d)(6) requires a person or entity making calls for telemarketing purposes to maintain a record of a consumer's request not to receive further telemarketing calls and to honor said do-not-call request.[1]  The Sixth Circuit has expressly referred to 47 C.F.R. § 64.1200(d) as a regulation arising out of 47 U.S.C. § 227(c)(1). *Charvat v. NMP, LLC*, 656 F.3d 440, 443-444 (6th Cir., 2011).

Notwithstanding Plaintiff's express do not call demands made to Defendants,

---

[1] These violations were also noted in the Complaint.  *See* ECF No. 1, PageID.21, ¶ 80.

Defendants initiated Call 14 encouraging Plaintiff to purchase a coffee mug. [ECF 1, PageID.21, ¶ 79]. Thus, at the time that Call 14 was initiated, there were well over two predicate violations under Section 227(c). First, there were Defendants' failures to record Plaintiff's do not call requests made during Calls 1, 3, 6, and 7 and/or to honor those do not call requests. Second, there was the Call 14, itself, which was a telephone solicitation initiated in violation of the 47 C.F.R. § 64.1200(c)(2) – Plaintiff's telephone number being listed on that National Do Not Call Registry.

### B.    Whether Call 14 Is Actionable

Defendants argue that "the one text that Mr. Dobronski complains about is an exempt political call... That is not a sale; it is the provision of a promotional item to someone who makes a political donation." [ECF No. 14, PageID.107].

47 C.F.R. § 64.1200(c)(2) proscribes:

> "No person or entity shall initiate any telephone solicitation to... a residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government...."

47 C.F.R. § 64.1200(f)(14) defines telephone solicitation:

> "The term *telephone solicitation* means the invitation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person...."

The text message received by Plaintiff during Call 14 was clear: Plaintiff was encouraged to pay $25, and in exchange, Plaintiff would receive a coffee mug. A coffee mug is certainly "property" or "goods". The coffee mug was not free. The transaction required that Plaintiff pay $25 to receive the coffee mug.

Defendants attempts to point to some vague terms of use disclosure which apparently appears on Defendants' web site does not change the situation.  That disclosure did not appear in the text message.  Nor, at this stage, may the Court consider evidence which does not appear within the four corners of the Complaint.

## IV.   DEFENDANTS PERSONAL ATTACKS UPON PLAINTIFF

Defendants devote a full page of their brief, and numerous pages of exhibits, to spewing personal attacks upon Plaintiff. [ECF No. 14, PageID.92-93; ECF No. 14-5; ECF No. 14-6; ECF No. 14-7; ECF No. 14-8; ECF No. 14-9; ECF No. 14-10].

Defendants point to ancient history from a quarter century ago when Plaintiff was a state court judge in Arizona.[2]  In Arizona, impeachment is essentially a political process. *Ingram v. Shumway*, 794 P.2d 147, 152, 164 Ariz. 514, 519 (Ariz.,1990). Then-Judge Dobronski was not accused of any crimes. Even if Dobronski had been charged with crimes, there is a limitation on using evidence of a criminal conviction

---

[2]     Judge Dobronski was the sole judge in the Scottsdale Justice Court, which court had one of the heaviest case load volumes of all Arizona justice courts (jurisdiction equivalent to a Michigan district court) in the state – adjudicating in excess of  15,000 civil, criminal and traffic cases each year.

after the passage of 10 years. Fed. R. Evid. 609(b). Instead, Judge Dobronski was accused of "judicial intemperance."

The "unprecedented barrage of complaints" [ECF No. 14, PageID.92] primarily came from approximately 31 tenants of Scottsdale Mobile Home Park, in Scottsdale, Arizona, who had organized a rent strike against their landlord. The landlord initiated forcible detainer actions against each of the 31 tenants, and the matters all proceeded to trial on the same day.[3] The day of the 31 trials was a circus-like event orchestrated by the tenants in affiliation with local news media. What Defendants have failed to explain is what relevance this ancient history has to the issues at hand in the litigation that is before this Court.

Defendants do not attach the Report and Recommendation ("R&R") of the ACJC, likely because the R&R belies many of the assertions being made the Defendants in their Motion. Instead, Defendants rely upon a newspaper article. [ECF No. 14-7]. It is well established that, if offered for the truth of the matter asserted, news articles are inadmissible hearsay. See *Croce v. Sanders*, 843 F. App'x 710, 718 (6th Cir. 2021) (news article inadmissible hearsay); *Davis v. Detroit Pub. Schs. Cmty. Dist.*, 835 F. App'x 18, 22 (6th Cir. 2020) (newspaper articles constitute inadmissible

---

[3]     In Arizona, a forcible detainer action is essentially a summary procedure. The typical forcible detainer trial is less than 5 minutes in duration. The only issue before the court is whether the rent was paid or not.

hearsay); *Park West Galleries, Inc. v. Global Fine Art Registry, LLC*, No. 08-12247, 2010 WL 987772, at *3 (E.D. Mich. Mar. 12, 2010) (same).

In the end, Judge Dobronski did resign.  Nevertheless, the citizens of Arizona rewarded Judge Dobronski for his dedicated public service with a lifetime pension, which Judge Dobronski has been dutifully collecting on a monthly basis for the past two decades.

Defendants also allege that Plaintiff "now abuses the legal system as a serial litigant of TCPA claims" [ECF No. 14, PageID.92] and attaches a publication by the U.S. Chamber of Commerce Institution for Legal Reform ("ILR") which argues that the Federal Communications Commission ("FCC") should not grant a Request for Clarification and Declaratory Ruling filed by Plaintiff with the FCC. [ECF No. 14-10]. Unexplained by Defendants – or, ILR – is how seeking clarification of an FCC regulation which is deemed by several courts to be confusing is an abuse of the legal system.  Indeed, the Sixth Circuit has admonished district courts that they should invoke the doctrine of primary jurisdiction and refer a matter to a relevant agency whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of that administrative body. *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir., 2010).

Similarly, Defendants criticize Plaintiff because "Dobronski has filed over sixty *pro se* complaints alleging TCPA violations in this Court alone" [ECF No. 14, PageID.92] and attaches an exhibit listing each case. [ECF No. 14-8]. But, Defendants offer no explanation and " did not cite a single decision supporting the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders." See *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir., 2006). Nothing in the Constitution, though, requires a plaintiff to be a naïf; Litigation is not college athletics: there is no "amateurs only" rule. *Cunningham v. Rapid Response Monitoring Services, Inc.*, 251 F.Supp.3d 1187, 1195 (M.D.Tenn., 2017). The statutory damages available under the TCPA are, in fact, specifically designed to appeal to plaintiffs' self-interest and to direct that self-interest toward the public good: "like statutory compensation for whistleblowers," they "operate as bounties, increasing the incentives for private enforcement of law." *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 492 (7th Cir. 2014). While Defendants are understandably frustrated by Plaintiff's efficacy, he is doing exactly what Congress intended — enforcing the law. See *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 881 (8th Cir. 2005) (recognizing that private right of action under TCPA demonstrates Congressional intent to incentivize aggrieved parties to act as "private attorneys

general").

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court enter its order that Defendants Winred, Inc's and Winred Technical Services, LLC's Motion for Rule 11 Sanctions [ECF No. 14] be **denied**.

Respectfully submitted,

Date: November 20, 2024

_____
Mark W. Dobronski
Post Office Box 99
Dexter, Michigan 48130-0099
markdobronski@yahoo.com
(734) 641-2300
Plaintiff *In Propria Persona*

## CERTIFICATE OF SERVICE

I hereby certify that on **November 20, 2024**, I electronically filed the foregoing *Plaintiff's Response in Opposition to Defendants Winred, Inc's and Winred Technical Services, LLC's Motion for Rule 11 Sanctions* with the Clerk of the Court via the Court's Pro Se Document Upload utility, which will send notification of such filing to all counsel of record via the CM/ECF system.

_____
Mark W. Dobronski

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**MARK W. DOBRONSKI,**                 Case No. **2:24-cv-12513-SJM-CI**

                   Plaintiff,           Honorable Stephen J. Murphy III
                                        United States District Judge

v.
                                        Honorable Curtis Ivy, Jr.
**WINRED, INC.**, *et al.*              United States Magistrate Judge

                   Defendants.

_____

## INDEX OF EXHIBITS

**EXHIBIT 1:**     "Safe Harbor" copy of Defendants Winred
                   Inc's and Winred Technical Services, LLC's
                   Motion for Rule 11 Sanctions

**EXHIBIT 2:**     Declaration of Mark W. Dobronski

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| **MARK W. DOBRONSKI** )<br><br>Plaintiff, )<br><br>**v.** )<br><br>**WINRED, INC.** )<br><br>**WINRED TECHNICAL SERVICES, LLC.** )<br><br>Defendants. | Civil Action No.: 2:24-cv-12513<br>Honorable Stephen J. Murphy III |

**DEFENDANTS WINRED, INC.'S AND WINRED TECHNICAL SERVICES, LLC'S**
**MOTION FOR RULE 11 SANCTIONS**

Defendants WinRed, Inc. and WinRed Technical Services, LLC (collectively, "Defendants") ask this Court to impose sanctions, pursuant to Federal Rule of Civil Procedure 11 against Plaintiff Mark W. Dobronski for filing this lawsuit without any evidentiary basis and for maintaining the lawsuit in the face of unequivocal evidence that the claims lack merit. Pursuant to Rule 11 and Local Rule 7.1, Defendants served Mr. Dobronski with a copy of this motion 21 days ago, on October 17, 2024, and asked him to withdraw his frivolous complaint or to concur in the motion. Defendants now file this motion for sanctions because Mr. Dobronski declined to withdraw his frivolous complaint or concur in this motion.

Dated: _____, 2024                    Respectfully submitted,

<div style="display:flex; justify-content:space-between;">

Christoper D. Man (DC Bar No. 453553)
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, DC 20036
T: 1-202-282-5000
F: 1-202-282-5100
CMan@winston.com

*S/-----------------------*
John Drosick (IL Bar No. 6326832)
*Counsel of Record*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
T: 1-312-558-5600
F: 1-312-558-5700
JDrosick@winston.com

</div>

1

*Counsel for WinRed, Inc. and WinRed Technical Services, LLC.*

**CERTIFICATE OF SERVICE**

I certify that on _____, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated: _____, 2024

*/s/*_____
John Drosick

*Counsel for WinRed, Inc. and WinRed Technical Services, LLC.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| **MARK W. DOBRONSKI** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| **v.** ) | Civil Action No.: 2:24-cv-12513 |
| ) | Honorable Stephen J. Murphy III |
| **WINRED, INC.** ) | |
| ) | |
| **WINRED TECHNICAL SERVICES, LLC.** ) | |
| ) | |
| Defendants. | |

**DEFENDANTS WINRED INC.'S AND WINRED TECHNICAL SERVICES, LLC'S
BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR RULE 11 SANCTIONS**

Christoper D. Man (D.C. Bar No. 453553)
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, DC 20036
T: 1-202-282-5000
F: 1-202-282-5100
CMan@winston.com

John Drosick (IL Bar No. 6326832)
*Counsel of Record*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
T: 1-312-558-5600
F: 1-312-558-5700
JDrosick@winston.com

*Counsel for Defendants WinRed, Inc. and WinRed Technical Services, LLC.*

**STATEMENT OF ISSUE PRESENTED**

Defendants WinRed, Inc. ("WRI" of "the PAC") and WinRed Technical Services, LLC ("WRTS," collectively "Defendants") seek sanctions under Federal Rule of Civil Procedure 11 against Mark W. Dobronski for filing this lawsuit without any evidentiary basis and refusing to dismiss this lawsuit even after Defendants provided objective evidence that his complaint lacked merit.

**MOST APPROPRIATE AUTHORITY FOR THE RELIEF SOUGHT**

The most appropriate authority for the relief sought is Federal Rule of Civil Procedure 11.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION.................................................................................................. 1

BACKGROUND.................................................................................................... 4

RULE 11 LEGAL STANDARD .............................................................................. 7

ARGUMENT......................................................................................................... 9

I.     NONE OF MR. DOBRONSKI'S CLAIMS HAVE A REASONABLE
       BASIS ......................................................................................................... 9

       A.     Mr. Dobronski Has No Basis For Alleging Defendants Sent Him
              Any Text Messages......................................................................... 9

       B.     Mr. Dobronski Consented To Receiving The Texts ...................... 12

II.    COUNT 1 FAILS TO CREDIBLY ALLEGE AN ATDS WAS USED...................... 14

III.   COUNT 2 FAILS TO CREDIBLY ALLEGE A VIOLATION ................................ 17

       A.     Mr. Dobronski Fails To Allege Multiple Calls................................ 17

       B.     The One Call Mr. Dobronski Does Allege Is Not Actionable Either............... 18

CONCLUSION..................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Aikens v. Synchrony Fin. d/b/a Synchrony Bank*,
  Civ. A. No. 15-10058, 2015 WL 5818911 (E.D. Mich. July 31, 2015) .............................. 15

*Camunas v. Nat'l Republican Senatorial Comm.*,
  570 F. Supp. 3d 288 (E.D. Pa. 2021) ......................................................................... 15-18

*Deleo v. Nat'l Republican Senatorial Comm.*,
  2021 U.S. Dist. LEXIS 210858 (D.N.J. Nov. 1, 2021) ...................................................... 8

*Dobronski v. Alarm Mgmt. II, L.L.C.*,
  2020 WL 6780267 (E.D. Mich. Nov. 18, 2020) ........................................................... 4, 12

*Elsman v. Standard Fed. Bank*,
  238 F. Supp. 2d 903 (E.D. Mich. 2003) ............................................................................ 4

*Facebook, Inc. v. Duguid*,
  592 U.S. 395 (2021) ..................................................................................................... 2, 14

*Horton v. WRTS*,
  No. JS20-00325D (Tx. Just. Ct. Oct. 12, 2021) .............................................................. 10

*King v. IB Property Holdings Acquisition*,
  635 F. Supp. 2d 651 (E.D. Mich. 2009) ............................................................................ 8

*Libby v. Nat'l Republican Senatorial Comm.*,
  551 F. Supp. 3d 724 (W.D. Tex. July 27, 2021) .............................................................. 18

*Mainstream Mktg. Servs. v. FTC*,
  358 F.3d 1228 (10th Cir. 2004) ....................................................................................... 17

*In re Mark W. Dobronski*,
  No. M-01-0006, Order (Ariz. Mar. 28, 2001) .................................................................... 3

*In re Mark W. Dobronski*,
  Nos JC-01-0001, JC-01-0002, Order (Ariz. Feb. 2, 2002) .................................................. 3

*Montell v. Diversified Clinical Servs., Inc.*,
  757 F.3d 497 (6th Cir. 2014) ............................................................................................. 8

*In re P2P Alliance*,
  FCC 2020 TCPA Declaratory Ruling, CG Docket No. 20-670 (June 25, 2020) ................ 2, 5

*In re Polyurethane Foam Antitrust Litig.*,
  165 F. Supp. 3d 664 (N.D. Ohio 2015) ........................................................................... 12

*Reo v. WRTS,*
    2021 WL 4713395 (N.D. Oh. Apr. 23, 2021) ................................................... 10

*Shirvell v. Gordon,*
    602 F. Appx. 601 (6th Cir. 2015) .............................................................. 8, 11

*Soliman v. Subway Franchisee Advert. Trust Fund, Ltd.,*
    104 F.4th 176 (2d Cir. 2024) ................................................................. 15, 17

*Tahfs v. Proctor,*
    316 F.3d 584 (6th Cir. 2003) ......................................................................... 8

*Whittaker v. WRTS,*
    No. 3:20-cv-08150-PCT-JJT, Pls. Notice of Voluntary Dismissal, ECF No. 41
    (D. Ariz. May 20, 2021) ............................................................................ 10

*Worsham v. WRTS,*
    C-12-CV-23-000085 (Md. Cir. Ct. Feb. 20, 2024) ...................................... 10

*WRI v. Ellison,*
    59 F.4th 934 (8th Cir. 2023) ....................................................................... 10

**Statutes**

47 U.S.C. § 227(a)(1) ........................................................................................ 14

47 U.S.C. § 227(a)(4) ........................................................................................ 12

47 U.S.C. § 227(b)(1)(A) .............................................................................. 12, 14

47 U.S.C. § 227(b)(1)(A)(iii) ...................................................................... 1, 7, 14

47 U.S.C. § 227(b)(3) ........................................................................................ 14

47 U.S.C. § 227(c) ............................................................................................. 18

47 U.S.C. § 227(c)(5) ..................................................................................... 3, 18

**Other Authorities**

11 C.F.R. § 100.53 ............................................................................................. 19

47 C.F.R. § 64.1200(c)(2) ........................................................................... 2, 8, 19

Eric J. Troutman, *MIXED BAG: Famous Litigator Mark Dobronski (TCPAWorld's
    W.H.?) Wins Some and Loses Some in New TCPA Ruling,* TCPAWORLD (Nov.
    20, 2023), https://tcpaworld.com/2023/11/20/mixed-bag-famous-litigator-
    mark-dobronski-tcpaworlds-w-h-wins-some-and-loses-some-in-new-tcpa-
    ruling/ ......................................................................................................... 4

Fed. R. Civ. P. 11 ................................................................................ 1, 7, 8, 12, 17

Fed. R. Civ. P. 11(b) .................................................................................... 8-9, 12

Fed. R. Civ. P. 11(c)(1) ....................................................................................... 9

FTC, *The Do Not Call Registry*, https://www.ftc.gov/news-events/topics/do-not-call-registry ......................................................................................... 18

Jono Kupferberg, *Beginners Guide To Peer-To-Peer Texting In 2023* (June 9, 2023), https://www.hubdialer.com/blog-post/peer-to-peer-p2p-texting-guide/ ................... 17

*Panel Recommends Sharp Penalty For Misconduct By Justice Of The Peace*, Az. Daily Sun (Sept. 9, 2021), https://azdailysun.com/panel-recommends-sharp-penalty-for-misconduct-by-justice-of-peace/article_a73c1350-4c01-5c80-945d-c1c5be29c243.html ....................................................................... 4

*Preventing Serial Filers from Abusing the TCPA,* U.S. Chamber of Commerce Institute for Legal Reform (Mar. 27, 2024), https://instituteforlegalreform.com/blog/preventing-serial-filers-from-abusing-the-tcpa/ .......................................................................................................... 5

U.S. Const. amend. I ........................................................................................... 5

## INTRODUCTION

Mr. Dobronski should be sanctioned because he filed a completely frivolous Complaint and—even after the baselessness of his claims was demonstrated to him with the service of this motion 21 days ago—he refused to honor his Rule 11 obligations to dismiss it. Mr. Dobronski brings two counts under the Telephone Consumer Protection Act ("TCPA"): Count 1 alleges Defendants made unwanted text solicitations for campaign donations to him through an automatic telephone dialing system ("ATDS") in violation of 47 U.S.C. § 227(b)(1)(A)(iii), and Count 2 alleges one of those texts violated 47 C.F.R. § 64.1200(c)(2) because it was made to a phone number on the Do Not Call Registry. The Complaint is deeply flawed both legally and factually, and those flaws should have been easy enough for him to identify before he filed suit. Once those flaws were demonstrated to him 21 days ago, Mr. Dobronski should have remedied his error by dismissing the Complaint. He did not, and now Defendants seek the sanctions of dismissing the Complaint and having Mr. Dobronski pay their attorneys' fees.

There are at least four fundamental factual and legal flaws in Mr. Dobronski's implausible complaint charging that Defendants violated the TCPA by causing him to be sent unwanted text messages soliciting donations to third-party political campaigns[1]:

*First*, there is absolutely no evidentiary basis to assert that Defendants sent or caused the text messages identified in the Complaint to be sent. In fact, the evidence is the opposite. And it should have been easy for Mr. Dobronski to confirm that Defendants had nothing to do with the texts being sent.

---

[1] It remains a mystery as to why Mr. Dobronski chose not to sue the actual senders of the text messages or even the campaigns that Mr. Dobronski was asked to donate to, but instead sued only WRTS and WRI which merely process such donations and distribute them to the campaigns as requested by a donor.

*Second*, both TCPA counts fail because Mr. Dobronski consented to these calls. He accepted WRTS' Terms of Use and Privacy Policies by donating through the WRTS campaign, and pursuant to those policies, Mr. Dobronski consented to receiving campaign-related calls from Defendants and third parties. Thus, although neither WRTS nor WRI sent Mr. Dobronski the texts in question, Mr. Dobronski consented to receiving these sorts of political texts from Defendants and third parties. (Ex. 1 (Lyk Decl. ¶21.))

*Third*, the TCPA prohibition charged in Count 1 does not apply to all calls, but only calls made by a narrowly defined "automatic telephone dialing system," and there is no basis to assert the texts Mr. Dobronski received were sent through such a device. *Facebook, Inc. v. Duguid*, 592 U.S. 395, 396 (2021) (holding that TCPA's ATDS definition excludes equipment that does not use a random or sequential number generator). To the contrary, political campaigns who make text solicitations typically hire a peer-to-peer ("P2P") vendor, and the FCC recognizes that P2P texts do not violate the TCPA. *See In re P2P Alliance*, FCC 2020 TCPA Declaratory Ruling, CG Docket No. 20-670 (June 25, 2020).

*Fourth*, the TCPA count charged in Count 2 fails because violations of the Do Not Call Registry are actionable only when someone "has received *more than one* telephone call within any 12-month period by or on behalf of the same entity" in violation of the applicable regulations and Mr. Dobronski has alleged only one such call. 47 U.S.C. § 227(c)(5) (emphasis added). Apparently recognizing that an exception exists that allows political solicitations to be made, Mr. Dobronski tries to dress up the one call alleged in this count as for "the purchase of goods" (Compl. ¶79), but even that is not true. On its face the text asks him to "give" a donation of at least $25 "to help defend and expand the Republican House Majority" and tells him that, if he did, he would be

sent a promotional coffee mug.  (*Id.* ¶78.)  That is not a sale, it is a campaign donation and would be treated as such by the Federal Election Commission ("FEC").  (Ex. 1 ¶29.)

Making matters worse, Mr. Dobronski has an appalling history of abusing the legal process. Despite not having a law degree, Mr. Dobronski somehow was elected Justice of the Peace in Scottsdale Justice Court, but he abused this office so badly that he received an unprecedented barrage of complaints.  As a result, the Commission on Judicial Conduct recommended Mr. Dobronski be removed from office and the Arizona Supreme Court stripped him of all his judicial authority.[2]  He then resigned.  The Arizona Supreme Court then sanctioned him by ordering by ordering him to pay the Commission $30,000 in attorneys' fees and then emphatically ordered that he "shall never again seek or hold judicial office in the State of Arizona."  *See In re Mark W. Dobronski*, Nos. JC-01-0001, JC-01-0002, Order (Ariz. Feb. 2, 2002) (Ex.  2.)

Mr. Dobronski now abuses the legal system as a serial litigant of TCPA claims.[3]  Since 2017, Mr. Dobronski has filed over sixty *pro se* complaints alleging TCPA violations in this Court alone.  (Ex. 4 (chart listing cases filed).)  In addition to his reputation as a prolific litigation hobbyist, he is reportedly "famous for his generally unpleasant disposition."[4] And Mr. Dobronski

---

[2] *See In re Mark W. Dobronski*, No. M-01-0006, Order (Az. Mar. 28, 2001) (Ex. 3.).  Reportedly, more than 40 complaints were filed against him, including making racist jokes about a Hispanic litigant's name, improperly threatening counsel and litigants with contempt, dangling handcuffs in front of defendants, denying parties the right to be heard, and making uninformed quick decisions simply to clear his calendar.  *See Panel Recommends Sharp Penalty For Misconduct By Justice Of The Peace*, Az. Daily Sun (Sept. 9, 2021), https://azdailysun.com/panel-recommends-sharp-penalty-for-misconduct-by-justice-of-peace/article_a73c1350-4c01-5c80-945d-c1c5be29c243.html

[3] *See, e.g.* Eric J. Troutman, *MIXED BAG: Famous Litigator Mark Dobronski (TCPAWorld's W.H.?) Wins Some and Loses Some in New TCPA Ruling*, TCPAWORLD (Nov. 20, 2023), available at https://tcpaworld.com/2023/11/20/mixed-bag-famous-litigator-mark-dobronski-tcpaworlds-w-h-wins-some-and-loses-some-in-new-tcpa-ruling/.

[4] *Preventing Serial Filers from Abusing the TCPA,* U.S. Chamber of Commerce Institute for Legal Reform (Mar. 27, 2024), available at https://instituteforlegalreform.com/blog/preventing-serial-filers-from-abusing-the-tcpa/.

has been sanctioned by this Court for filing a frivolous complaint in at least one of those cases.

*See Dobronski v. Alarm Mgmt. II, L.L.C.*, 2020 WL 6780267 at *7-8 (E.D. Mich. Nov. 18, 2020).

It is time for Mr. Dobronski's abuse of the legal system—particularly in this Court—to stop. That

is precisely why Rule 11 sanctions exist. *See Elsman v. Standard Federal Bank*, 238 F. Supp. 2d

903, 908 (E.D. Mich. 2003) ("The central purpose of Rule 11 is to deter baseless filings in district

court.") (citing *Cooter & Gell v. Hartzmarx Corp.,* 496 U.S. 384, 393 (1990)).[5]

## BACKGROUND

Political fundraising for candidates and campaigns is at the heart of the First Amendment

and, in the modern era, most campaign donations are made electronically by credit card. Given

the routine and essential nature of these solicitations, candidates and campaigns typically hire a

legally compliant platform to assist in processing such donations. WinRed is widely used platform

for right of center candidates and campaigns, and it operates similarly to ActBlue, which provides

a platform for left of center candidates and campaigns.

Although WRI and WRTS share "WinRed" in their name, they are separately

incorporated entities. (Ex. 1 ¶5.) WRTS created the website and provides the "back end" services

that WRI uses to collect contributions for certain political committees and then transmits those

contributions to the recipient political committees in accordance with FEC rules and regulations.

(*Id.* ¶ 8). In effect, WRI is a client of WRTS. (*Id.* ¶ 6.) WRI is a non-connected political action

committee registered with the FEC and the entity that receives federal incoming "earmarked"

contributions made via the WRTS platform. In rare instances, a campaign may have a merchant

account that received contributions directly from WRTS without going through the PAC. An

---

[5] Much of the Complaint is littered with inflammatory irrelevancies about the TCPA being enacted to prevent a barrage of robocalls, tying up phone lines of emergency responders, and fraudulent telemarketing schemes. Not even Mr. Dobronski alleges WRTS or WRI did any of these things.

"earmarked" contribution is simply a contribution for a specific political committee that cannot be sent anywhere else.

Each candidate and campaign that uses the WRTS platform creates its own webpages, which typically tout the merits of the campaign and solicit donations. The campaigns often advertise through other mediums, such as television and radio commercials, internet posts, flyers, yard signs, in person canvassing, emails and text messages, and those advertisements often direct people to the WRTS website for payment.

Neither WRI nor WRTS ever solicit donations on behalf of the candidates or campaigns that use the WRTS website, and neither ever send text messages for commercial purposes.[6] Nevertheless, because the campaigns or others who send text messages in support of a candidate or campaign often include a link to the WRTS website so donations can be made (anyone can copy any website link and paste it into a text message), text recipients sometime mistake WRTS or WRI as the sender of the text.

But it is easily discoverable by the recipient of the text messages—such as Mr. Dobronski—that WRTS and WRI are not the sender of these messages. Typically, the text message itself identifies the sender. For example, candidates commonly introduce themselves, explain what they seek to accomplish, and solicit a donation. Solicitations for campaign donations always identify the campaign being supported as well.

To avoid any confusion, the home page of WRTS's website maintains a "Donor Support" section. Users who click on Donor Support are asked their reason for contacting. One reason

---

[6] Recently, WRI and WRTS have added a feature where they may solicit tips for themselves. The solicitation is made on the website only *after* a donor has agreed to give to a campaign. Neither WRTS nor WRI sends emails or texts soliciting tips. *See* https://support.winred.com/en/articles/9169216-tips-faq.

listed is "Text Messages and Emails" from a dropdown menu.  When clicked by a user, the webpage instructs: "If you are receiving text messages containing WinRed links, these are not being sent by us.  They are likely being sent by a campaign or other organization using WinRed to raise money."  Https://winred.com/support/.

Under the heading "Unsubscribing from Donation Requests," the webpage further directs a user to contact the actual messenger:

> If you are receiving text messages containing WinRed links, these are not being sent by us.  They are likely being sent by a campaign or other organization using WinRed to raise money.  Likewise, emails you receive asking for donations are also likely sent by a campaign or committee.  If it is being sent from WinRed, it will be sent from the email domain @winred.com.  To unsubscribe from texts or emails not sent by WinRed, you will need to contact whoever is messaging you.  Or you can reply STOP to text messages and click the UNSUBSCRIBE link in emails.

*Id.*

WinRed users that make a donation through the website—such as Mr. Dobronski who made a $100 donation on April 11, 2020 to Trump Make America Great Again committee—are required to accept WRTS' Terms of Use Policy and Privacy Policy, which make clear (1) that they are consenting to receive text messages from candidates and campaigns, from WRTS and WRI, and from other third parties, and (2) as WRTS's Privacy Policy states in bold, WRTS "**does not make calls or send text messages for marketing purposes**."  (Ex.1(A).)  This guidance also is provided if a user seeks to contact WRTS through a direct message on the WRTS website, a chat function through a bot on the website, by email or by placing a call to WRTS.  Thus, Mr. Dobronski, like all WinRed users, has consented to receive political texts from third parties and knew (or should have known) that no text solicitations would be made by WRTS or WRI.

Mr. Dobronski also should have known that neither WRTS nor WRI was sending him text messages because he never provided them the phone number that received the text messages.  He

gave a different phone number when donating through the WRTS platform.  (Ex. 1 ¶16.)

Despite the fact that neither WRTS nor WRI sent Mr. Dobronski text solicitations, Mr. Dobronski filed a Complaint on September 25, 2024, in this Court alleging WRTS and WRI committed eighty-three violations of the TCPA, specifically by violating 47 U.S.C. § 227(b)(1)(A)(iii) (Count 1) and 47 C.F.R. § 64.1200(c)(2) (Count 2).  (Compl. ¶¶ 74-81).  None of the phone numbers that sent the text messages are associated with WRTS or WRI, nor does WRTS nor WRI have the phone number that Mr. Dobronski complains received the text messages in its database.  So, the entire basis for his complaint is that whoever sent the text messages included a link to the WRTS website in those texts.  (Compl. ¶65.)  That is woefully insufficient to state a claim under the TCPA.

Tellingly, Mr. Dobronski has not provided the text messages that were sent.  It is fair to assume this evidence would gut his allegations by establishing that WRTS and WRI did not send the text messages.  And 79 of the 82 links that he includes are inoperable, so there is no evidence that they do link to the WRTS website.  Of course, even if it were true that someone copied an internet link to a website and sent the text message, that is hardly evidence that the website provider sent the text.  People commonly copy and paste links to websites into texts and emails that they send others without any knowledge by the website provider that those messages have been sent.

### RULE 11 LEGAL STANDARD

By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an unrepresented party . . .  certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and] (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b).

Rule 11 "'stresses the need for some pre-filing inquiry into both the facts and the law to satisfy the affirmative duty imposed.'" *Shirvell v. Gordon*, 602 F. Appx. 601, 604-5 (6th Cir. 2015) (quoting *Merritt v. Int'l Ass'n of Machinists & Aero. Workers*, 613 F.3d 609, 626 (6th Cir. 2010)). This legal standard applies the same to unrepresented parties who sign their names to a pleading as it does to parties represented by counsel. In *King v. IB Property Holdings Acquisition*, 635 F. Supp. 2d 651 (E.D. Mich. 2009), the Court emphasized that a party proceeding *pro se* must abide by Rule 11's requirements and that dismissal is an appropriate sanction for a *pro se* party's intentional misrepresentations.

When a party fails to abide by these requirements, Rule 11(c)(1) authorizes the Court to "impose an appropriate sanction on any attorney, law firm, *or party* that violated the rule or is responsible for the violation" (emphasis added). Rule 11 sanctions are appropriate when the district court determines that conduct is not "reasonable under the circumstances." *See Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 510 (6th Cir. 2014). Reasonableness must be assessed under an "objective standard," meaning a good faith belief in the merits of a case is not sufficient to avoid sanctions. *See Tahfs v. Proctor*, 316 F.3d 584, 594 (6th Cir. 2003).

## ARGUMENT

## I.    NONE OF MR. DOBRONSKI'S CLAIMS HAVE A REASONABLE BASIS

### A.    Mr. Dobronski Has No Basis For Alleging Defendants Sent Him Any Text Messages

Neither WRTS nor WRI send text message solicitations in support of any campaigns. Neither WRTS nor WRI engages in any solicitations on behalf of campaigns; those activities are left to the campaigns and others. WRTS is merely a payment platform and WRI is merely the PAC by which contributions flow to reach the campaigns designated by donors. Solicitations are not

8

part of the WinRed business model.  Additionally, none of the phone numbers Mr. Dobronski identifies as having sent the text messages to him are associated with WRTS or WRI in any way, and neither WRTS nor WRI even knew the phone number that received the text messages.  As a result, neither WRTS nor WRI sent messages to Mr. Dobronski.

Solicitors typically identify both themselves and the campaigns they support in text messages, which largely clears up any mystery about the sender's identity.  But WinRed goes further and makes clear that neither WRTS nor WRI is the sender.  In donating through WRTS' website, Mr. Dobronski agreed to a Privacy Policy that specifically told him in bold that WRTS "**does not make calls or send text messages for marketing purposes**." (Ex. 1(A).)  The website further instructs: "If you are receiving text messages containing WinRed links, these are not being sent by us.  They are likely being sent by a campaign or other organization using WinRed to raise money."  Https://winred.com/support.  And even if Mr. Dobronski's pre-filing due diligence did not alert him to these facts, he was certainly aware of them 21 days ago when this sanctions motion was sent to him, but he still has not withdrawn his complaint in the face of this evidence.

Mr. Dobronski has no reason to believe anything to the contrary, just the opposite.  He claims, "Defendants have been previously haled into federal court for similar violations of the TCPA" (Compl. ¶ 76), but he should see from those cases that no plaintiff has prevailed in a TCPA claim against either WRTS or WRI. [7]  He certainly was alerted to that fact when he was served with this motion 21 days ago.  Mr. Dobronski has been disingenuous with the Court by not adding that every time WRTS or WRI has been haled into court for an alleged TCPA violation, WRTS

---

[7] Curiously, Mr. Dobronski cites to federal litigation concerning subpoenas issued by state Attorneys General concerning WinRed.  Compl. ¶ 63; *see WRI v. Ellison*, 59 F.4th 934 (8th Cir. 2023).  Those subpoenas and investigations had nothing to do with text messages or the TCPA and, long after compliance was made with those subpoenas, not a single Attorney General has brought any claims of wrongdoing against WRTS or WRI.

and WRI have prevailed because they do not send text messages in violation of the TCPA.  *See Reo v. WRTS*, 2021 WL 4713395, at *3 (N.D. Oh. Apr. 23, 2021); *Whittaker v. WRTS*, No. 3:20-cv-08150-PCT-JJT, Pls. Notice of Voluntary Dismissal, ECF No. 41 (D. Ariz. May 20, 2021); *Worsham v. WRTS*, C-12-CV-23-000085 (Md. Cir. Ct. Feb. 20, 2024) (Ex. 5.); *Horton v. WRTS*, No. JS20-00325D (Tx. Just. Ct. Oct. 12, 2021) (Ex. 6.).

Moreover, Mr. Dobronski cannot even plausibly allege how he believes WRTS or WRI would have his phone number.  When Mr. Dobronski submitted a donation through WRTS, he provided a different phone number than the one he now complains received the unwanted text messages.  (Ex. 1 ¶16.)  Neither WRTS nor WRI knew the phone number was associated with Mr. Dobronski or had any record of the phone number that received the text messages.

The only basis for Mr. Dobronski's claims is his speculation that WRTS or WRI must have been involved in sending the texts because whoever sent him the text messages included links to the WRTS website, but that ignores the fact that WRTS and WRI play no part in soliciting donations on behalf of campaign, they make that explicit to donors and on its website, and they did not even have the phone number that received the text messages.

Anyone can copy a website link and paste it into a text message.  The process of copying a link to a webpage and texting it to someone is not unique to the political sphere.  People may do the same in texting someone the link to a website with information they find interesting, such as a news article, a picture, a GoFundMe webpage or other charitable solicitation, or even an opinion on this Court's website, and a child hoping to get what he or she wants for a birthday may text parents links to websites, such as Amazon, where what they want can be purchased.  Recipients may not always welcome those texts, but that is a dispute between the sender and the receiver. Because links to all websites can be copied and texted, ecommerce and the internet itself would

10

cease to exist if simply maintaining a website could become a basis for civil liability whenever a website's link is improperly texted by a third party.  (Ex. 1 ¶18.)  Just because an individual can send a text with a link to WRTS' website does not mean that WRTS or WRI is the sender of those texts or that either Defendant is in an agency relationship with the true senders and thus can be liable for their actions.

Moreover, of the 82 calls that Mr. Dobronski identifies as having links that lead to the WRTS website, 79 of them are inoperable and do not lead anywhere.  Thus, even under Mr. Dobronski's erroneous theory that a website provider is liable for a TCPA violation whenever someone copies and pastes a link to that website into an unwanted text message, his complaint is still lacking evidentiary support.

Sanctions are warranted because Mr. Dobronski simply failed to engage in any meaningful "pre-filing inquiry," *Shirvell*, 602 F. Appx. at 604-605, and his claims lack "evidentiary support" even "after an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b), or, worse, he ignored all the facts inconsistent with his theory of liability.  After WRTS and WRI gave Mr. Dobronski advance notice of this sanctions motion and an opportunity to cure his mistake by dismissing the Complaint, Mr. Dobronski doubled down and chose to proceed even after notice of his errors and that this motion for sanctions was coming.

This is a pattern and practice of Mr. Dobronski.  He faced sanctions and an award of attorneys' fees and costs for pursuing a similar baseless tactic in *Dobronski v. Alarm Mgmt. II, L.L.C.*, 2020 WL 6780267, at *4 (E.D. Mich. Nov. 18, 2020).  There, as here, Mr. Dobronski's claim that a defendant called him was "devoid of facts" providing any reasonable basis to conclude the defendant placed the calls.  *Id.*  This Court (Judge Cleland) took into account that Mr. Dobronski is bound by Rule 11 as a litigant, even if not an attorney, and that he should know better

based on his legal experience as a judge (even a disgraced judge).  *See also In re Polyurethane Foam Antitrust Litig.*, 165 F. Supp. 3d 664, 666 (N.D. Ohio 2015) ("[P]ro se filings do not serve as an impenetrable shield, for one acting pro se has no license to harass others, clog the judicial machinery with meritless litigation, and abuse already overloaded court dockets.").  Since then, Mr. Dobronski has filed an avalanche of more TCPA cases.  Even more importantly, Mr. Dobronski was alerted to the frivolous nature of his complaint through advance service of this motion.  His refusal to use the cure period provided by Rule 11 to correct his mistake constitutes willful misconduct warranting sanctions.

## B.      Mr. Dobronski Consented To Receiving The Texts

There is no viable TCPA claim under either count because Mr. Dobronski consented to receive the text messages.  Section 227(b)(1)(A) at issue in Count 1 has an exception where a call is "made with the prior express consent of the called party."  Likewise, the TCPA excludes persons with "an established business relationship" from the calls that are prohibited by the Do Not Call Registry, as alleged in Count 2.  *See* 47 U.S.C. § 227(a)(4), (c)(1).

Although Mr. Dobronski claims he never consented to being texted and never had an established business relationship with the Defendants, that is not true.  Mr. Dobronski used the WRTS platform to make a $100 donation on April 11, 2020 to Trump Make America Great Again Committee.  In doing so, just below the "Donate" button that he clicked to complete the transaction it read: "By clicking 'Donate' I accept WinRed's terms of use and privacy policy."  The underlined terms conveniently linked to those policies.  By agreeing to those terms, Mr. Dobronski agreed to receive text messages from WRTS, the PAC, and others.  (Ex. 1 ¶21.)

The Privacy Policy Mr. Dobronski agreed to states: "We, political committees or campaigns, or page creators that use our Platform, or other third parties may contact you about your contribution, or the candidate, political committee or campaign to whom you contributed or

other candidates, campaigns or issues that may be of interest to you." (Ex. 1(A).)  A specific heading in the policy also stated that information could be used "For Marketing Purposes," explaining: "We might use your information to serve you ads about specific candidates or remind you to make or complete a contribution.  We might tell you about new features or updates.  We, our partners, or page creators, political committees or campaigns, may also use your information to send you electronic communications, including through email or text message."  *Id.*

Another specific heading stated that information could be used "With Third Parties for Marketing Purposes," and explained: "This may include political committees or campaigns of candidates that may be of interest to you.  These third parties may also share your information with others.  These third parties may use your information for their own marketing purposes or the marketing purposes of others." (*Id.*)  Plaintiff also was advised that his information would be shared with the campaign he supported and that "[p]age creators, political committees, campaigns, or third parties that receive your information from page creators, political committees or campaigns, may send you political communications or other marketing communications, and may use your information for purposes including the promotion of the Republican Party."  *Id.*  Finally, under the heading "Communications from Political Committees, Campaigns and Other Third Parties," the Privacy Policy provided: "If you wish to opt out of receiving marketing communications from any third party, please contact that third party directly to do so."  *Id.*

To be clear, neither WRTS nor WRI sent Mr. Dobronski the text messages that he complains about receiving, but Mr. Dobronski consented to receiving text messages from Defendants, as well as political campaigns and others promoting Republican candidates.  Thus, Mr. Dobronski's complaint has no plausible basis to claim that the Defendants caused these texts to be sent or that

he did not consent to receiving these types of text messages. Proceeding with this litigation anyway is sanctionable.

## II.   COUNT 1 FAILS TO CREDIBLY ALLEGE AN ATDS WAS USED

Mr. Dobronski failed to allege any credible basis to believe the TCPA has been violated in Count 1. Section 227(b)(1)(A)(iii) does not prohibit all calls, but only calls made through a narrowly defined ATDS device. While Defendants have no idea who sent the texts to Mr. Dobronski, WRTS and WRI do not send text messages through an ATDS, nor do political campaigns generally use this type of service since the TCPA was passed. Instead, political campaigns typically make text solicitations through a TCPA-compliant P2P vendor.

Section 227(b)(1)(A) prohibits calling "any telephone number assigned to a . . . cellular telephone service" using "any automatic telephone dialing system" absent "prior express consent of the called party." *See also* 47 U.S.C. § 227(b)(3) (providing a private right of action). An ATDS is defined as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The Supreme Court has strictly construed that limitation. *Facebook, Inc. v. Duguid*, 592 U.S. 395, 396 (2021).

There is no reason why sophisticated political candidates (including elected Members of Congress) would risk TCPA liability and annoying prospective voters by using an ATDS when P2P methods are a commonplace legal alternative. To comply with the TCPA, political campaigns that solicit text donations typically hire a P2P vendor. (Ex. 1 ¶13.) The key feature of a modern P2P system is that it only sends a text message after a person *manually*, usually through the click of mouse, sends each individual message to the numbers to be texted. The FCC released a declaratory ruling confirming P2P texting complies with the TCPA. *See In re P2P Alliance*, FCC 2020 TCPA Declaratory Ruling, CG Docket No. 20-670 (June 25, 2020). Moreover, political

14

campaigns typically work from likely donor lists, rather than by sending texts to random or sequential numbers. *See Soliman v. Subway Franchisee Advert. Trust Fund, Ltd.*, 104 F.4th 176, 180 (2d Cir. 2024) (explaining "[t]hree circuits—the only circuit courts to consider the issue—have held that the TCPA covers only ATSDs that generate *telephone* numbers, that is, systems that do not rely on pre-existing lists of telephone numbers" and joining those circuits).

Although Mr. Dobronski alleges an ATDS was used to make the calls, it is a conclusory claim without any evidentiary basis. Threadbare allegations an ATDS was used are not enough; plaintiffs must offer some reason to believe an ATDS was used. *See, e.g.*, *Aikens v. Synchrony Fin. d/b/a Synchrony Bank*, Civ. A. No. 15-10058, 2015 WL 5818911, at *3 (E.D. Mich. July 31, 2015), *report and recommendation adopted*, 2015 WL 5818860, at *1 (E.D. Mich. Aug. 31, 2015). "[C]ourts permit the allegation of an automatic system to be pled on information or belief, but require additional factual information, such as the absence of a relationship between the parties and the random nature of the automation device." *Camunas v. Nat'l Republican Senatorial Comm.*, 570 F. Supp. 3d 288, 293 (E.D. Pa. 2021) (quoting *Zemel v. CSC Holdings*, 2018 WL 6242484, at *3 (D.N.J. Sept. 21, 2020)). And "[a] plaintiff must provide 'at least some [ ] detail regarding the content of the messages or calls, thereby rend[ering] the claim that an ATDS was used more plausible.'" *Id.* (quoting *Norman v. Sito Mobile Sols.*, 2017 WL 1330199, at *3 (D.N.J. Apr. 6, 2017)).

Mr. Dobronski does not even include copies of the alleged text messages and his only explanation for his claim an ATDS was used is the "generic and impersonal nature of the texts messages and the use of a link in each message," as well as "the fact that, when Plaintiff send [sic] a 'STOP' message in response to a received text message, a nearly instantaneous response of 'You

15

have successfully unsubscribed' is received." (Compl. ¶¶71-72). These allegations provide no support for the conclusion that the senders used an ATDS system rather than a P2P system.

Campaign solicitation text messages sent through a P2P system may seem generic and impersonal, but that is because text messages are inherently short and the purpose of campaign text solicitations is to deliver the same message: a request for campaign donations. Moreover, there is no reason to believe the text messages were sent to him randomly or based on a sequential number, as campaign text solicitations rarely work that way. Instead, vendors typically target prior donors to similar campaigns. Although Mr. Dobronski generally has not identified which campaigns he was asked to support, it would seem likely that he was being asked to support other Republican candidates based on his prior history of giving to President Trump's campaign and perhaps other campaigns. Indeed, that is true of the only text message that Mr. Dobronski does provide where he is asked to make a donation "to help defend and expand the Republican House Majority." (Compl. ¶78.) Given the legality and prevalence of P2P systems for political fundraising, Mr. Dobronski has no good faith basis, nor did he allege one, that a text solicitor would go out of its way to use a system that would be unlawful under the TCPA.

The fact that Mr. Dobronski received an automated response to a "STOP" text message that he sent back does not prove an ATDS was used to send texts to him. This is a standard convention of P2P texting tools. *See, e.g.*, Jono Kupferberg, *Beginners Guide To Peer-To-Peer Texting In 2023* (June 9, 2023), https://www.hubdialer.com/blog-post/peer-to-peer-p2p-texting-guide/. Accordingly, the use of a "STOP" function does not establish that an ATDS was used. *Soliman*, 101 F.4th at 178 (affirming dismissal of a TCPA claim that alleged an ATDS was used based on a "STOP" function being included in a text). To the contrary, use of the "STOP" convention is another indicator that P2P texting was used.

16

Mr. Dobronski's unsupported speculation that he received messages from an ATDS system, when he has no personal knowledge or factual basis to distinguish those messages from lawful P2P systems, is substantiated by nothing more than wishcasting. This is not adequate to satisfy his Rule 11 burden. He should be sanctioned for persisting with this frivolous litigation.

## III. COUNT 2 FAILS TO CREDIBLY ALLEGE A VIOLATION

### A. Mr. Dobronski Fails To Allege Multiple Calls

Mr. Dobronski attempts to state a claim under Section 227(c)(5), but he fails to even allege a key element, that he "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the [applicable] regulations." 47 U.S.C. § 227(c)(5). He alleges only a single unlawful call was made in Count 2. (Compl. ¶¶78-79.)

Mr. Dobronski does not rely upon the other calls listed in Count 1 because he apparently recognizes that, "[b]ecause of the limits to FTC's authority, the Registry does not apply to political calls." FTC, *The Do Not Call Registry*, https://www.ftc.gov/news-events/topics/do-not-call-registry; *see also Mainstream Mktg. Servs. v. FTC*, 358 F.3d 1228, 1234 (10th Cir. 2004) ("[t]he national do-not-call registry's restrictions apply only to telemarketing calls made by or on behalf of sellers of goods or services, and not to charitable or political fundraising calls."); *Camunas v. Nat'l Republican Senatorial Comm.*, 570 F. Supp. 3d 288, 301 (E.D. Penn. 2021) (same); *Libby v. Nat'l Republican Senatorial Comm.*, 551 F. Supp. 3d 724 (W.D. Tex. July 27, 2021) (dismissing because "political organizations are exempt from the Do Not Call Registry"); *Deleo v. Nat'l Republican Senatorial Comm.*, 2021 U.S. Dist. LEXIS 210858, at *21 (D.N.J. Nov. 1, 2021) (holding plaintiff could not maintain a claim because "political organizations are exempt from the Do-Not-Call Registry's restrictions").

Mr. Dobronski was explicitly told 21 days ago that, without at least one other call, his claim failed as matter of law, yet he continued to pursue Count 2. That is sanctionable.

**B.**     **The One Call Mr. Dobronski Does Allege Is Not Actionable Either**

Even the one text that Mr. Dobronski complains about is an exempt political call.   Mr. Dobronski ignores the plain language of the text message he complains about in an effort to recast a political solicitation as a solicitation for the "purchase of goods, to wit: a coffee mug" in violation of 47 C.F.R. § 64.1200(c)(2).   (Compl. ¶¶79-80).   On its face the text asks him to "give" a donation of at least $25 "to help defend and expand the Republican House Majority" and tells him that, if he did, he would be sent a promotional coffee mug.   (*Id.* ¶78.)   That is not a sale, it is the provision of a promotional item to someone who makes a political donation.   (Ex. 1 ¶29.)

As Ryan Lyk, CEO of WRST, explains: "Campaigns often generate promotional items for things, such as t-shirts or coffee mugs, with logos or messages that promote the campaign.   Given the cost of creating these items, campaigns often distribute them to people who have demonstrated an interest in supporting a campaign, such as those who donate over certain dollar thresholds." (Ex. A ¶28.)   Even when a promotional item is provided in response to a donation to a federal campaign, no part of the donation is treated as a sale.   The entire donation amount is reported to the FEC and the full donation amount counts against a donor's contribution limits.   (*Id.* ¶29; *see also* 11 C.F.R. § 100.53 ("[T]he entire amount paid as the purchase price for a fundraising item sold by a political committee is a contribution.").)

Additionally, Mr. Dobronski agreed with WRTS' Terms of Use Policy, which explained that "[i]n certain circumstances, you may be eligible to receive certain products in connection with your Contribution" and that the provision of such products is exclusively an arrangement between the donor and recipient campaign.   (Ex. 1 ¶30; *see also* Ex. 1(A).)   Mr. Dobronski was advised: "You agree and acknowledge that [WRTS] is not a party or an agent of any transaction conducted via the Platform."   (*Id.*)   Thus, it should have been clear to Mr. Dobronski that nether WRTS nor

18

WRI have anything to do with promotional items; that is exclusively an issue between a donor and the campaign offering the promotional item.

Whether or not Mr. Dobronski read the text closely enough to determine that no sale of goods was proposed before filing the Complaint, he certainly was made aware of that when he was served this motion more than 21 days ago.  His refusal to cure his improper complaint by dismissing it flouts the very purpose of Rule 11's notice and opportunity to cure provision. Sanctions are warranted.

## CONCLUSION

Defendants request that Mr. Dobronski be sanctioned with the dismissal of his complaint and an award of attorneys' fees to Defendants.

Respectfully submitted,


Christoper D. Man (D.C. Bar No. 453553)
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, DC 20036
T: 1-202-282-5000
F: 1-202-282-5100
 CMan@winston.com

/S------------------------------
John Drosick (IL Bar No. 6326382)
 *Counsel of Record*
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
T: 1-312-558-5600
F: 1-312-558-5700
JDrosick@winston.com

*Counsel for WinRed, Inc. and WinRed Technical Services, LLC.*

19

**CERTIFICATE OF SERVICE**

I certify that on _____, 2024, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send a notice of electronic filing to all registered

parties.

Dated: _____, 2024          /S/_____
                                 John Drosick

                                 *Counsel for WinRed, Inc. and WinRed Technical*
                                 *Services, LLC.*

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**MARK W. DOBRONSKI,**

Case No. **2:24-cv-12513-SJM-CI**

Plaintiff,

Honorable Stephen J. Murphy III
United States District Judge

v.

**WINRED, INC.,** *et al.*

Honorable Curtis Ivy, Jr.
United States Magistrate Judge

Defendants.

---

## DECLARATION OF MARK W. DOBRONSKI

I, MARK W. DOBRONSKI, do declare under penalty of perjury, as follows:

1. I am the Plaintiff *pro se* in the above-captioned matter.

2. If sworn as a witness in this matter, I could testify competently to the facts set forth in this declaration.

3. I am familiar with the Response ("Response") in Opposition to Defendants Winred, Inc's and Winred Technical Services, LLC's Motion for Rule 11 Sanctions which this declaration is attached as an exhibit in support thereof.

4. On October 17, 2024, I received via electronic mail from Christopher Man, a "safe harbor" copy of Defendants Winred, Inc.'s and Winred Technical Services, LLC's Motion for Rule 11 Sanctions, including Brief and exhibits.

5. A true copy of the Motion and Brief, excluding the exhibits, as received by me on October 17, 2024 are attached to this Response at EXHIBIT 1.

6. I did not receive a copy of the Motion and Brief via United States Mail.

7. As a *pro se* party, I am not an registered user of the Court's electronic filing system.

8.  I have not consented in writing to delivery by any other means under Fed. R. Civ. P. 5.

9.  The "safe harbor" copy of the motion received by me on October 17, 2024 differs in numerous respects from the Defendants Winred, Inc.'s and Winred Technical Services, LLC's Motion for Rule 11 Sanctions [ECF No. 14] which was served upon me.

I declare under penalty of perjury that the foregoing is true and correct.

Date: November 20, 2024

Mark W. Dobronski